THE VILLAGE OF NORTHBROOK, Plaintiff-Appellee, *v.* THE VILLAGE OF GLENVIEW, Defendant-Appellant.—(ROBERT A. SOMERS *et al.*, Intervening Plaintiffs-Appellees; HARRIS TRUST AND SAVINGS BANK, Trustee, Intervening Defendant-Appellant.)

First District (4th Division)    No. 79-1753

Opinion filed September 4, 1980.

Ancel, Glink, Diamond & Murphy, P. C., of Chicago (Marvin J. Glink, Ronald S. Cope, and Mary Denise Cahill, of counsel), for appellant.

Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago (Frederic O. Floberg, R. Marlin Smith, Barbara Baran, and James M. Phipps, of counsel), for appellee.

Bilandic, Neistein, Richman, Hauslinger & Young, Ltd., of Chicago (Harry A. Young, Jr., of counsel), for other appellees.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

This appeal is brought by defendant and defendant-intervenor from a judgment entered on an order of the circuit court of Cook County granting plaintiff's motion for summary judgment and denying defendant's and defendant-intervenor's cross-motions for summary judgment.

We reverse. The facts in this case are undisputed.

Plaintiff, Village of Northbrook, and defendant, Village of Glenview, are two municipal corporations located in Cook County north of Chicago. It appears that in 1967 the southern boundary of Northbrook was located between two and three miles from the northern boundary of Glenview. Between these two boundaries was a stretch of unincorporated territory which was essentially undeveloped.

In 1967, both villages had official comprehensive plans for the present and future development of their villages. By law, such comprehensive plans, and ordinances implementing those plans, may be made applicable to any unincorporated land located within 1½ miles of the boundaries of the municipality. (Ill. Rev. Stat. 1979, ch. 24, par. 11—12—5.) It is evident that on frequent occasions unincorporated land is located within 1½ miles of the respective boundaries of two municipalities. To avoid conflicts between the plans of two municipalities and between the ordinances implementing those plans, those municipalities are legally permitted to enter into jurisdictional boundary line agreements to establish a line within the overlapping territory beyond which line neither village will exercise planning control. Ill. Rev. Stat. 1979, ch. 24, par. 11—12—9.

In 1967, it appears that a stretch of unincorporated land approximately four miles long and one-half mile wide was land located within 1½ miles of both the southern boundary of Northbrook and the northern boundary of Glenview. Hence, in 1967, Northbrook and Glenview entered into an alleged jurisdictional boundary line agreement. Under the terms of this agreement, Willow Road, which ran down the center of the overlapping territory, became the jurisdictional boundary line between the two villages, with Northbrook exercising control over the unincorporated land north of Willow Road and Glenview exercising control over such land south of Willow Road.

Besides establishing a jurisdictional boundary line, the parties agreed to several other terms, one of which is the essence of the controversy here. The parties agreed that Willow Road was not to be the ultimate boundary between the two villages and both villages could, in the future, annex any land north or south of Willow Road subject to a certain condition. That condition provided that if the land annexed by either village was located within one-quarter mile south of Willow Road or one-quarter mile north of Willow Road then that land *"may* be rezoned for single-family residence development on lots not less than 12,000 square feet." (Emphasis added.) At the time of the agreement most of the land in this Willow Road corridor was zoned under a Cook County zoning ordinance for single-family units on lots not less than 20,000 square feet.

Between the years 1967 and 1979, both Northbrook and Glenview annexed territory within this Willow Road corridor. From the record it appears that Glenview annexed one tract of land and rezoned it as a public lands district and another tract of land and rezoned it as R-18, a residential classification allowing multiple-family units. Northbrook appears to have annexed 11 tracts of land, five of which were rezoned as single-family residential districts with minimum lot sizes of 12,000 square feet or more. The other six tracts were rezoned as follows: (a) three tracts were rezoned R—8, a residential classification which allows forty percent of the units to be two-family and multiple-family units with the balance of the units to be single-family residences, all with allowable minimum lot sizes of a much greater density than 12,000 square feet per unit; (b) one tract was rezoned R-6, a general residence district allowing two-family and multiple-family units on minimum lot sizes of 5,000 to 7,500 square feet per unit; (c) one tract was rezoned R-5, a residential classification allowing single-family units on minimum lot sizes of 7,500 square feet; and (d) one tract was rezoned M-1, a manufacturing classification. The officers of both Glenview and Northbrook had pre-notice of each village's annexations and rezonings and none of these officers ever objected to any of these rezonings.

Sometime in 1979, Glenview and defendant-intervenor, Harris Bank, entered into a pre-annexation agreement pursuant to Glenview's power to do so under section 11—15.1—1 of the Municipal Code (Ill. Rev. Stat. 1979, ch. 24, par. 11—15.1—1). Under the terms of this agreement, Glenview promised to annex an undeveloped 45-acre tract of land legally owned by Harris Bank and to rezone it as a commercial district upon annexation. These 45 acres were located in the Willow Road corridor just north of Willow Road.

Subsequently, Glenview began the necessary hearings required to annex and rezone the 45 acres. An officer of Northbrook attended one of

these hearings and read into the record Northbrook's official protest of the proposed annexation and rezoning. The basis of Northbrook's protest was the jurisdictional boundary line agreement entered into between Northbrook and Glenview in 1967. Northbrook alleged that Glenview could not annex the land and rezone it commercial, but, because of the 1967 agreement, Glenview could only annex the land and rezone it for single-family units on minimum lots of 12,000 square feet per unit. Glenview denied the validity and effect of the 1967 agreement and Northbrook subsequently brought this action in the circuit court of Cook County.

Northbrook's complaint sought both a declaratory judgment and an injunction. It asked the court to declare that the 1967 agreement was legally binding and still in effect and that the terms of this agreement prohibited Glenview from annexing the 45 acres and rezoning them for any use other than single-family units on minimum lots of 12,000 square feet per unit. Northbrook asked the court to enjoin Glenview from proceeding with its hearings to annex the property and rezone it commercial.

Glenview's answer denied that the 1967 agreement was legally binding and as a defense asserted that Northbrook had repeatedly annexed and rezoned property in the Willow Road corridor for uses other than single-family residences on minimum lots of 12,000 square feet per unit. Subsequently, Harris Bank petitioned to intervene as a defendant and a group of homeowners residing on unincorporated land next to the 45 acres petitioned to intervene as plaintiffs. Both of these petitions were granted subject to the condition that neither intervenor could raise issues not raised by Northbrook or Glenview. Thereafter, the homeowners filed a complaint which essentially restated Northbrook's allegations. Harris Bank filed an answer restating Glenview's contentions and adding as a defense that the 1967 agreement, if interpreted as Northbrook alleged, was not validly entered into because two municipalities cannot enter into an agreement that prevents one of those municipalities from being able to exercise exclusive zoning power over land annexed to that municipality.

Thereafter, Northbrook moved for summary judgment. Glenview and Harris Bank filed separate cross-motions for summary judgment. Glenview alleged that the term of the 1967 agreement which said that any land annexed by either village in the Willow Road corridor "may" be rezoned for use as single-family residences on minimum lots of 12,000 square feet was intended by the parties to be entirely permissive and hence unenforceable. Glenview also alleged that, if the term was a mandatory restriction, Northbrook's conduct between 1967 and 1979 constituted either a repudiation or waiver of the agreement and that Northbrook should be estopped from asserting the agreement was enforceable or be barred by the "clean hands" doctrine from seeking equitable relief.

Harris Bank's motion reiterated Glenview's contentions and also asserted that the agreement was not validly entered into for the reason given in its answer to the complaint.

After a hearing, the trial court granted Northbrook's motion for summary judgment and denied Glenview's and Harris Bank's cross-motions. Thereafter, the trial court entered judgment for Northbrook and enjoined Glenview from proceeding with its annexation and rezoning hearings. This appeal followed.

On appeal, all of the parties have reasserted the contentions made below. Following the filing of all the briefs, Northbrook moved this court to strike those portions of the Harris Bank brief which raise the issue of the two villages' power to enter into an agreement which restricts the zoning power of one village over land annexed to that village. Northbrook alleges that neither Northbrook nor Glenview raised this issue at the trial-court level, and Harris Bank is precluded from raising this issue because the order allowing it to intervene prohibited Harris Bank from raising any issues not raised by Northbrook or Glenview. We took this motion with the appeal and we will decide it here.

OPINION

I

The first issue for our consideration is the interpretation to be given to the term in the 1967 agreement which allowed either village to annex land within the Willow Road corridor subject to the condition that if the land was annexed it "may" be rezoned for single-family units on minimum lots of 12,000 square feet per unit. The parties appear to be in agreement that this contract term created an ambiguity in the contract, and we agree there is an ambiguity.

The contract term has two possible interpretations. Northbrook and the homeowners allege that the word "may" should be interpreted to mean "shall." In support of this allegation the parties have cited *Binder v. Langhorst* (1908), 234 Ill. 583, 85 N.E. 400, and *Figures v. Swank* (1970), 128 Ill. App. 2d 211, 263 N.E.2d 599. In both cases it was held that the word "may" in a statute shall be interpreted to mean "shall" where the public interest and public rights are concerned. Though concededly the public interest is involved in this case, we do not have before us a statute but a contract entered into between the two villages. Also, we believe that the parties to the contract could not possibly have intended the word "may" to mean "shall." At the time of the 1967 agreement, most of the land within the Willow Road corridor was zoned for single-family units on minimum lots of 20,000 square feet per unit. Hence, what the parties could have intended by use of the word "may" was that land annexed in the corridor could be left zoned as is or rezoned for single-family units with minimum lots of

12,000 square feet per unit or any greater minimum lot size. This is one possible interpretation of the term of the contract.

The other possible interpretation is the one alleged by Glenview and Harris Bank. They contend that the term of the contract was intended to be advisory only and not intended as a maximum restriction on rezoning of the property. We agree with this contention.

■■ When contract language is ambiguous, the intended meaning of that language may be derived from the circumstances surrounding the formation of the contract (*La Throp v. Bell Federal Savings & Loan Association* (1977), 68 Ill. 2d 375, 370 N.E.2d 188, *cert. denied* (1978), 436 U.S. 925, 56 L. Ed. 2d 768, 98 S. Ct. 2818), and it may be derived from the conduct of the parties subsequent to its formation (*Chicago & Northwestern Ry. Co. v. Peoria & Pekin Union Ry. Co.* (1977), 46 Ill. App. 3d 95, 360 N.E.2d 404). We believe the circumstances existing at the time of the making of the 1967 agreement and the subsequent conduct of Northbrook and Glenview clearly show that the term of the contract in question was intended by the parties to be advisory only.

We consider first the circumstances existing at the time of the making of the 1967 agreement. This requires an analysis of the existing law familiar to the parties at that time.

The jurisdictional boundary line agreement states that it was entered into pursuant to the two villages' power under section 11—12—9 of the Municipal Code. That section and its related sections were essentially the same in 1967 as they are now. Section 11—12—9 reads in part as follows:

> "If unincorporated territory is within one and one-half miles of the boundaries of two or more corporate authorities that have adopted official plans, the corporate authorities involved may agree upon a line which shall mark the boundaries of the jurisdiction of each of the corporate authorities who have adopted such agreement." Ill. Rev. Stat. 1979, ch. 24, par. 11—12—9.

As has long been the law, a municipal corporation has only those powers granted to it by the constitution of this State or by statutes enacted by the legislature. (*E.g., Martin v. City of Greenville* (1977), 54 Ill. App. 3d 42, 369 N.E.2d 543.) Though such powers need not be expressly granted, it is at least required that they be implied from the language of the enabling law. *E.g., Appeal Board of Department of Environmental Control v. United States Steel Corp.* (1971), 48 Ill. 2d 575, 272 N.E.2d 46.

Section 11—12—9 of the Municipal Code gives a municipality the express power to determine a jurisdictional boundary line. Nothing in the statute expressly gives a municipality the power to enter into an agreement that would limit its or another municipality's power to rezone unincorporated land upon annexation. If such a power exists, it must arise by implication.

Of course, we need not determine whether such a power is implied under the language of section 11—12—9. We are attempting to discern here only the intention of the parties when they made the contract. The parties obviously believed that some implied power existed under section 11—12—9. The question is whether it was more reasonable for them to believe that they had the implied power to merely recommend possible rezoning upon annexation rather than the implied power to control rezoning upon annexation. If it was more reasonable for them to believe that they had only an implied power to recommend rezoning, that would be a strong indication they intended the controversial term of the agreement to be advisory only. We believe that if any implied power arises under section 11—12—9, it is more reasonable to conclude that the parties believed that it was only the implied power to recommend possible rezoning upon annexation. We reach this conclusion because of the relation of section 11—12—9 to other sections of the Municipal Code.

Section 11—12—9 is found in division 12 of the Municipal Code. (See Ill. Rev. Stat. 1979, ch. 24, par. 11—12—4 *et seq.*) Division 12 is concerned with the power of a municipality to adopt and implement official comprehensive plans to assure the orderly development of the community. Such plans may be made applicable to unincorporated land within one and one-half miles of the municipality's boundaries. (Ill. Rev. Stat. 1979, ch. 24, par. 11—12—5.) Division 12 is not concerned with the power to zone land or to rezone land upon annexation. Though comprehensive plans may many times recommend possible rezoning in the future, the plans themselves are advisory only. (Ill. Rev. Stat. 1979, ch. 24, par. 11—12—6.) In fact, the only place the word "zoning" is mentioned in division 12 is in section 11—12—5. There, in reference to unincorporated land contiguous to the municipality, it is said that a municipality may enact ordinances implementing the comprehensive plan, which ordinances "may designate [unincorporated] land suitable for annexation and the *recommended* zoning classification for such land upon annexation." (Emphasis added.) Ill. Rev. Stat. 1979, ch. 24, par. 11—12—5(1)(c).

Since section 11—12—9 is found in division 12, it is possible that the parties, when they entered into the jurisdictional boundary line agreement, could have assumed that section 11—12—5(1)(c) quoted above gave rise to some implied power of the municipalities under section 11—12—9. The parties could have reasonably believed that since a municipality could by ordinance designate unincorporated land suitable for annexation and recommend zoning classification of that land upon annexation, then two municipalities, when they entered into a jurisdictional boundary line agreement concerning such unincorporated land, could agree to designate land suitable for annexation to either municipality and *recommend* possible rezoning of that land upon annexation.

Hence, the parties could have reasonably believed they had the implied power to recommend rezoning upon annexation. Since nothing in division 12 concerns the power to control zoning upon annexation, it is more reasonable to conclude that the parties believed they were exercising, by the terms of the 1967 agreement, the implied power to recommend possible rezoning rather than intending to control either municipality's power to rezone land upon annexation. Thus, it is more reasonable to conclude that the contract term was intended to be advisory only.

This conclusion is further buttressed by an analysis of other divisions of the Municipal Code familiar to the parties in 1967. Most important is section 11—13—1 of the Code (Ill. Rev. Stat. 1979, ch. 24, par. 11—13—1). That section, found in division 13 of the Code, concerns the power of a municipality to zone land. There it is said that once unincorporated land is annexed to a municipality, that municipality "shall thereafter exercise all zoning powers and regulations over the annexed area." It appears evident that anyone reading this section would express strong doubt that two municipalities could enter into an agreement which gave one municipality the right to limit another municipality's power to exercise zoning control over annexed land even when rezoning was contemplated to occur simultaneously with annexation.

It cannot be assumed that the parties to the 1967 agreement were ignorant of the above provisions of section 11—13—1. Hence, because of section 11—13—1, it is more reasonable to conclude that the parties, in the 1967 agreement, intended only to recommend possible rezoning upon annexation rather than to establish an enforceable limit to possible rezoning upon annexation. To conclude that the parties intended an enforceable limit to rezoning would be to conclude that the parties intended to enter into an agreement which faced a strong possibility of being declared illegal. It is much more reasonable to conclude that the parties intended only to recommend possible rezoning since there was little possibility that such an agreement, or principle, would be declared illegal.

This conclusion holds despite a section of the Municipal Code existing in 1967 which allowed municipalities to jointly exercise powers set forth in the Municipal Code. In section 1—1—5 of the Code, it is said, "The corporate authorities of each municipality may exercise jointly, with one or more other municipal corporations * * * all of the powers set forth in this Code unless expressly provided otherwise." (Ill. Rev. Stat. 1979, ch. 24, par. 1—1—5.) Though we need not determine whether zoning is a power that can be exercised jointly, it is sufficient to point out that the joint exercise of a power is something quite different from one municipality being able to prevent the exercise of such power by another municipality.

Hence, we necessarily conclude that because of the circumstances existing at the time of the making of the 1967 agreement, it is more

reasonable to conclude that the parties intended to only recommend possible rezoning upon annexation rather than to limit the power of either municipality to rezone land upon annexation.

We turn now to a discussion of the parties' subsequent conduct after the 1967 agreement. To us, this conduct conclusively proves that the parties only intended to recommend possible rezoning upon annexation.

Eight different tracts of land were annexed by the parties within the Willow Road corridor and rezoned differently from that mentioned in the agreement. Neither party ever objected to these rezonings. Not until 1979, 12 years after the signing of the jurisdictional boundary line agreement, did Northbrook decide to object on the basis of that agreement.

Northbrook has attempted to minimize the effect of its rezoning of six tracts of land. It points out that five of those tracts were rezoned residential and in one of those tracts the present density is, in fact, in conformity with 12,000 square feet minimum lot size. As to the tract of land rezoned for manufacturing, Northbrook alleges this is only a small tract of land and it is located next to an area that is properly zoned manufacturing.

As to the contention that the development of one of the zones actually conforms to the agreement though zoned improperly, Northbrook overlooks that the 1967 agreement dealt with zoning of land and not with what the owners of land within that area actually did with that land. Also, as to the manufacturing area, the agreement did not concern itself with any exception for land specifically covered by the controversial term of the agreement because its best use may have been manufacturing rather than residential.

Accordingly, we must conclude that the subsequent conduct of the parties clearly shows, when considered with the circumstances existing in 1967, that the rezoning term of the 1967 agreement was intended to be advisory only.

II

We next consider Northbrook's motion to strike those parts of Harris Bank's brief attacking the legality of the 1967 agreement. In light of our expressed conclusions, we believe the issues concerning this motion are now moot. Since the zoning term of the 1967 agreement was intended to be advisory only, the issue of whether the villages had the power to enter into an agreement restricting zoning upon annexation need not be determined in this case. Hence, we deny the motion to strike simply because it is irrelevant to our decision.

In conclusion, we note that nothing in this decision is to be construed to mean that the proposed rezoning is proper. That issue will only be determined by proper proceedings before the proper administrative body. If any of the plaintiffs here can show the necessary standing to challenge

the rezoning of the 45 acres, they can pursue their remedies provided under traditional zoning law.

Accordingly, for the reasons noted, we deny Northbrook's motion to strike several parts of the brief of Harris Bank, and reverse the decisions of the trial court granting Northbrook's motion for summary judgment and denying Glenview's and Harris Bank's cross-motions for summary judgment. Since the parties concede that no genuine issue of material fact exists, we order that summary judgment should be entered for Glenview and Harris Bank.

Reversed.

JOHNSON and JIGANTI, JJ., concur.