THE VILLAGE OF ORLAND HILLS, Plaintiff-Appellee, v. CITIZENS UTILITIES COMPANY OF ILLINOIS *et al.*, Defendants-Appellants.

First District (1st Division)   No. 1—02—1450

Opinion filed March 15, 2004.

Eric P. Hanson, of Mahoney, Silverman & Cross, Ltd., of Joliet, for appellant Citizens Utilities Company of Illinois.

Terrence M. Barnicle and James V. Ferolo, both of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant Village of Tinley Park.

Mark H. Sterk and Amy E. Smith, both of Odelson & Sterk, Ltd., of Evergreen Park, and John Murphey, of Rosenthal, Coblentz, Murphey & Janega, and James J. Roche, of James J. Roche & Associates, both of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff, the Village of Orland Hills (Orland Hills), brought this action seeking a declaratory judgment that defendant Citizens Utilities Company of Illinois (Citizens)[1] was obligated to provide water service to an undeveloped parcel of land recently annexed into Orland Hills and that Citizens' water supply contract with defendant, the Village of Tinley Park (Tinley Park), did not preclude such service. The parties filed cross-motions for summary judgment. The circuit court granted plaintiff's motion for summary judgment and denied defendants' joint motions for summary judgment. This appeal fol-

---

[1]Citizens transferred its rights under the contract to Illinois-American Water Company (Illinois-American) in January of 2002. In March of 2002, the circuit court substituted Illinois-American for Citizens as the water company defendant in the proceeding. For the sake of simplicity, this court will continue to refer to Illinois-American as Citizens.

lowed. For the reasons that follow, we reverse the judgment of the circuit court.

## BACKGROUND

The underlying facts of this case are not in dispute. In 1962, Orland Hills, then known as the Village of Westhaven, enacted Ordinance 62—0—018, which granted to the predecessor of Citizens, the Fernway Utility Co., "the franchise, right and privilege of supplying the Village of Westhaven and all the inhabitants of said Village within the present and future corporate limits of said Village with water." The franchise expired by its terms on December 31, 1991. It is undisputed that since the expiration of the ordinance, Citizens and Orland Hills have continued to act consistently with its terms. In particular, Citizens has continued to provide water service to the residents of Orland Hills.

From 1962 to 1982, Citizens serviced the residents of Orland Hills with well water. In February of 1982, however, Citizens entered into a water supply contract (hereinafter, Tinley Park/Citizens Water Supply Contract, or Water Supply Contract) with adjacent municipalities which had access to Lake Michigan water, namely, the Village of Tinley Park, the City of Oak Forest and the Village of Oak Lawn (Oak Lawn), in order to provide Lake Michigan water, rather than well water, to residents of Orland Hills. As was stated before the circuit judge, "Lake Michigan water is infinitely preferable to well water." Pursuant to the terms of that contract, Citizens agreed to purchase Lake Michigan water from Oak Lawn and Tinley Park agreed to allow Citizens to receive Lake Michigan water through its water distribution system. The Water Supply Contract also contained several restrictions. First, Citizens could not extend its water service within Tinley Park, nor could Citizens use the Lake Michigan water purchased under the Water Supply Contract to service any customers within a restricted area referred to as the "Tinley Park planning area as shown on the map attached hereto." Second, the Water Supply Contract prohibited Citizens from connecting its water distribution system, except for emergency purposes, to any wells, so long as its water distribution system was connected to Tinley Park's water works distribution system.

Citizens is an Illinois public utility regulated by the Illinois Commerce Commission (the Commission). The Commission expressly approved the Water Supply Contract after conducting hearings. In 1985, upon a regulatory directive by the Commission, the term of the Water Supply Contract was extended through September 30, 2006.

Attached to the Water Supply Contract and setting forth the restricted area in which Citizens may not provide water service was a

map of the "Tinley Park planning area" as it existed in 1982. It encompassed an area of southwest Cook County located south of 171st Street and bounded on the east by 86th Avenue, on the west by Route 45, and on the south by Interstate 80. The "epicenter" of this lawsuit is the so-called "A&M Parcel"[2] located within the restricted area described in the Water Supply Contract. The A&M Parcel consists of 11½ acres of unimproved real estate, located at approximately 171st Street and 94th Avenue.

In November of 1999, Orland Hills entered into a land annexation agreement with the original owner and the original developer of the A&M Parcel, binding these parties and their successors in interest.[3] Under the annexation agreement, Orland Hills was responsible for extending all water service to the parcel. The annexation agreement also provided: "[a]fter closing developer may petition to disconnect [from Orland Hills] on or before December 30, 2000 and [Orland Hills] will grant such petition."

When Orland Hills requested Citizens extend the water service to the A&M Parcel, both Citizens and Tinley Park objected to the request, asserting that Citizens was prohibited from supplying the water to the parcel by the restrictions in the Water Supply Contract. In November of 1999, Orland Hills filed a complaint for declaratory judgment,[4] seeking a declaration that Citizens was obligated to provide water service to the parcel. Shortly thereafter, the original owner of the A&M Parcel sold 9 of the 11½ acres to the original developer, contemporaneously with the now owner/developer and Orland Hills amending the annexation agreement with respect to the right to disconnect the property from Orland Hills.

In April of 2000, several more land conveyances took place, resulting in First Bank and Trust Company of Illinois (First Bank) holding nine acres of the A&M Parcel as a trustee under a trust agreement, and Glenbrook Development of NML, L.L.C. (Glenbrook), becoming a successor developer of this portion of the parcel. In May of 2000, First Bank and Glenbrook petitioned Orland Hills to disconnect their portion of the A&M Parcel, citing the annexation agreement and stating

---

[2]The A&M Limited Partnership was the original owner of the property.

[3]Tinley Park had filed a lawsuit to fight the annexation. The circuit court ruled in favor of Orland Hills. People ex rel. Village of Tinley Park v. Village of Orland Hills, 00 CH 0685. Tinley Park did not appeal from that decision.

[4]The circuit court dismissed the initial complaint without prejudice on June 14, 2000, for failure to plead the existence of an actual controversy. Similarly, the circuit court dismissed the amended complaint filed on June 22, 2000, again, for failure to plead an actual controversy. The second amended complaint was filed on November 22, 2000.

that they were exercising their right to disconnect before the December 30, 2000, deadline. Orland Hills denied this petition. In December of 2000, First Bank and Glenbrook filed a lawsuit in the circuit court of Cook County, asking the court to order Orland Hills to grant their petition to disconnect from Orland Hills, so that their portion of the A&M Parcel could be annexed into Tinley Park, where it could be supplied by Tinley Park with Lake Michigan water.[5] The circuit court dismissed the disconnection suit, finding that First Bank's and Glenbrook's right to disconnect, per the amended annexation agreement, was dependent on the outcome of the instant case. It could be exercised if Citizens was found not obligated to supply water to the A&M Parcel. This court affirmed the judgment of the circuit court in the disconnection suit.[6]

Meanwhile, Orland Hills moved for summary judgment in this water supply suit, seeking a declaration that Citizens was obligated to provide water service to the A&M Parcel and that the Tinley Park/Citizens Water Supply Contract did not relieve Citizens of this obligation. Citizens and Tinley Park filed a joint motion for summary judgment, contending that Citizens was precluded by the terms of the Water Supply Contract from providing Lake Michigan water to the A&M Parcel, and that it was similarly precluded from providing well water to the parcel using the same distribution system as it does to service its customers with Lake Michigan water.

The circuit court granted Orland Hills' motion for summary judgment and denied Citizens' and Tinley Park's joint motions for summary judgment on the grounds that although the franchise agreement had expired, an implied-in-fact contract for water services existed between Orland Hills and Citizens, and that it would be against public policy for Citizens, a public utility that continued to operate in Orland Hills long after the expiration of its franchise, to now state that it no longer has the obligation to provide water service to *all* of the inhabitants of Orland Hills. Citizens and Tinley Park now appeal. It appears that the property, which is zoned commercial, remains undeveloped.

## ANALYSIS

■ The standard of review on appeal from a grant of summary judgment is *de novo*. *Harrison v. Hardin County Community Unit*

---

[5]The brief of appellant Tinley Park before this court stated that Tinley Park is prepared to annex the property in question as soon as it is disconnected from Orland Hills. Regarding water service, the counsel for Tinley Park stated in the circuit court, "Tinley Park is prepared to provide water tomorrow if they come to us."

[6]See *First Bank & Trust Co. of Illinois v. Village of Orland Hills*, 338 Ill. App. 3d 35, 787 N.E.2d 300 (2003).

*School District No. 1*, 197 Ill. 2d 466, 470-71, 758 N.E.2d 848, 851 (2001). Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2002); *Chavda v. Wolak*, 188 Ill. 2d 394, 403, 721 N.E.2d 1137, 1143 (1999). Defendants argue that the circuit court erred in granting Orland Hills' motion for summary judgment and denying defendants' joint motions for summary judgment. The essence of defendants' arguments is that the franchise ordinance had long expired, whereas the Water Supply Contract has not expired and it clearly prohibits Citizens from providing Lake Michigan water purchased under the contract to the A&M Parcel and that this contract should be enforced according to its terms. Defendants call this court's attention to the relevant provisions of the Water Supply Contract. Paragraph 6 of the Water Supply Contract provides:

"Citizens agrees that it will not extend its water service within Tinley Park. Citizens will not use water purchased under this Agreement within the *Tinley Park planning area as shown on the map attached hereto*." (Emphasis added.)

Paragraph 9 of the Water Supply Contract provides, in part:

"Citizens agrees that immediately upon the connection of its water works distribution system to the Tinley Park water system as provided for herein, it will physically disconnect its present well(s) from its water system and will not thereafter reconnect any well(s) during the term of this contract, or any extension thereof, unless its water distribution system is physically disconnected from the Tinley Park water system or is no longer receiving Lake Michigan water from Oak Lawn through Tinley Park's water system."

Defendants contend that the language of the Water Supply Contract is unambiguous in that it prohibits Citizens from providing Lake Michigan water purchased under the contract to the A&M Parcel and, in addition, prohibits Citizens from servicing the parcel with well water while its distribution network is connected to Tinley Park's water system. Defendants argue that where the terms of a contract are clear and unambiguous, as they are here, the contract must be enforced as written. *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 112, 618 N.E.2d 418, 423 (1993).

Plaintiff, on the other hand, maintains that although the franchise agreement between it and Citizens had expired, because Citizens continued to provide service to customers within Orland Hills, Citizens is bound by the service obligations of a contract implied in fact between Orland Hills and Citizens to continue service on the same terms as

the expired franchise. See *Sprague v. Biggs*, 390 Ill. 537, 552, 62 N.E.2d 420, 427 (1945); *B-C Cable Co. v. City & Borough of Juneau*, 613 P.2d 616, 619 n.5 (Alaska 1980) (if a franchise between a utility and a municipality expires but the utility continues to provide service, an implied contract arises under the same terms and conditions as the expired grant); *City of Richmond v. Chesapeake & Potomac Telephone Co. of Virginia*, 205 Va. 919, 924, 140 S.E.2d 683, 686 (1965) (when the franchise expired, the utility continued to operate under an implied contract cancelable upon reasonable notice under the same terms and conditions as the franchise ordinance); 12 McQuillin on Municipal Corporations § 34.51 (3d rev. ed. 1995) (if a company continues to operate after its franchise has expired, it does so under an implied contract, cancelable upon reasonable notice, under the same terms and conditions as the franchise ordinance).

■ In *Sprague* our supreme court quoted with approval the following holding of *Iowa City v. Iowa City Light & Power Co.*, 90 F.2d 679, 682 (8th Cir. 1937):

" 'It is well settled that a public service utility operating under a city franchise is not released from its duty to render service at the moment its franchise runs out. Where the city inhabitants have become dependent upon the service and no other arrangements have been made to supply it, the obligation to serve remains on the utility whose properties still occupy the streets and public places. *** The reciprocal duties which result from necessity when the term of the franchise expires are no less certain because the conditions are of indefinite duration.' " *Sprague v. Biggs*, 390 Ill. at 552, 62 N.E.2d at 427, quoting *Iowa City*, 90 F.2d at 682.

Thus, it is plaintiff's position that Citizens is contractually obligated to serve the A&M Parcel with water, and furthermore, plaintiff should not be bound by the onerous restrictions in the Tinley Park/Citizens Water Supply Contract, to which it is a stranger. Moreover, plaintiff contends that the existence of an implied contract between plaintiff and Citizens is not even disputed by Citizens, as Citizens admitted the following in its response in opposition to the Village of Tinley Park's motion to dismiss complaint for declaratory judgment:

"Citizens' and Orland Hills' conduct regarding the supply of water is consistent with the expired Ordinance. Therefore, it is axiomatic that the terms and conditions of the Ordinance continue to govern Citizens' relationship with Orland Hills."

In light of the cited authority, Citizens' continued provision of service to customers in Orland Hills, and this admission, we agree with plaintiff that the circuit court was correct in its ruling that an implied-in-fact contract existed between Orland Hills and Citizens.

■ Defendants next argue that even if such an implied contract does exist on the same terms as the expired franchise ordinance, the contract does not impose an affirmative, *mandatory* obligation on Citizens to provide service to the A&M Parcel because, under Illinois law, the language contained in a municipality's grant of a franchise conferring on a grantee a "right, privilege and franchise" is construed as " 'permissive and enabling, not imperative and obligatory.' " *Village of Upper Alton v. Alton Gas & Electric Co.*, 165 Ill. App. 333, 335 (1911), quoting *State v. Southern Minnesota R.R. Co.*, 18 Minn. 40, 49 (1871). Plaintiff, in its brief before this court, fails to respond to this argument. Moreover, during the arguments before this court, plaintiff conceded that it could not cite to any Illinois authority interpreting a grant of franchise to impose a mandatory obligation on the grantee. Plaintiff's concession is fatal to its position that, under the implied contract, Citizens has a mandatory obligation, rather than mere permission, to supply water services to the A&M Parcel.

In any event, it would be futile for plaintiff to argue that the terms of the implied contract bound Citizens with such a mandatory obligation because, as defendants assert, municipal control over public utilities has been preempted by the statewide regulatory authority of the Commission under the Public Utilities Act (hereinafter, the Act) (220 ILCS 5/1—101 *et seq.* (West 2002)), which we will more fully discuss below. *City of Geneseo v. Illinois Northern Utilities Co.*, 378 Ill. 506, 514, 39 N.E.2d 26, 31 (1941) (wherever the Public Utilities Act has granted a specific right or power which may conflict with a like right or power enumerated among those of cities and villages, the former will prevail as a repeal, by implication, of such rights vested in the municipality); *Commonwealth Edison Co. v. City of Warrenville*, 288 Ill. App. 3d 373, 379, 680 N.E.2d 465, 470 (1997) ("utility regulation is not a matter pertaining to local government and affairs. Rather, the regulation of public utilities is purely a problem of statewide concern"); *Kirwin v. Peoples Gas Light & Coke Co.*, 173 Ill. App. 3d 699, 528 N.E.2d 201 (1988) (the Act preempted municipal powers to regulate public utilities). Because the Act expressly empowers the Commission to supervise all public utilities (220 ILCS 5/4—101 (West 2002)) and includes in the definition of a "public utility" any entity which "owns, controls, operates or manages, within this State, *** any plant, equipment or property used or to be used for *** the production, storage, transmission, sale, delivery or furnishing of *** water" (220 ILCS 5/3—105 (West 2002)), and all parties to this action agree that Citizens is a public utility regulated by the Commission, plaintiff Orland Hills is preempted by the Act from exerting any control over the operations of Citizens.

Moreover, preemption applies not only where a municipality attempts to regulate a public utility by a municipal ordinance, but also where it attempts to do so through a franchise agreement or a contract. *City of Geneseo*, 378 Ill. at 523, 530, 39 N.E.2d at 35, 38 (although the power vested in cities to permit or refuse a license or franchise to a public utility has not been repealed by the provisions of the Public Utilities Act, the Commission has exclusive power "over the acts of the utility exercised by reason of the franchise or permit" (emphasis omitted)). Due to the preemption of municipal regulatory control over public utilities, a franchise agreement can no longer be used as a means for a municipality to control the provision of service by a public utility. *City of Peoria v. Peoria Water Co.*, 49 Ill. App. 3d 1066, 364 N.E.2d 1003 (1977) (municipality may not seek specific performance of a franchise agreement between it and a water company because its right in that regard was preempted by the Public Utilities Act). In *City of Peoria*, the court explained:

> "It is irrelevant that a municipal franchise ordinance has been accepted and acted upon by the grantee utility, for such an ordinance cannot 'stand in the way of the lawful exercise, by the Commerce Commission, of the regulatory police powers conferred upon it by the General Assembly.' (*City of Chicago v. Illinois Commerce Comm'n ex rel. Chicago & Western Indiana R.R. Co.* (1934), 356 Ill. 501, 510, 190 N.E. 896, 900.) *Nor can a preexisting contract be considered a limitation on the exercise of the State's police power."* (Emphasis added.) *City of Peoria*, 49 Ill. App. 3d at 1068-69, 364 N.E.2d at 1005.

We further note that the franchise ordinance had expressly recognized this preemptive power of the Commission, as it provided, in relevant part, in section 13:

> "[T]his ordinance shall constitute a contract between the parties hereto and, *subject to the rights and powers vested in the Illinois Commerce Commission* \*\*\* shall be the measure of the rights, powers, obligations, privileges and liabilities of [Orland Hills] and [Citizens]." (Emphasis added.)

Accordingly, plaintiff's right to enforce its implied contract with Citizens, whatever its terms may be, is preempted by the exclusive regulatory authority of the Commission. Nor may plaintiff claim that its implied contract with Citizens supercedes the Tinley Park/Citizens Water Supply Contract which was expressly approved by the Commission.

■ We next turn our attention to the Tinley Park/Citizens Water Supply Contract. As a preliminary matter, we note that this contract is not preempted by the regulatory authority of the Commission under the Act. Although it appears that this contract is very similar to the

Orland Hills/Citizens implied contract, in a sense that it is a contract between a municipality and a public utility, in fact it is not. Rather, it is a contract between two utilities: a municipal utility company operated by Tinley Park and a public utility, Citizens. This is so because Tinley Park is not regarded to be acting in its municipal governmental capacity with respect to the operation of its water supply business; it is regarded to be acting in a proprietary, business capacity. *Baltis v. Village of Westchester*, 3 Ill. 2d 388, 398, 121 N.E.2d 495, 500 (1954) (It is a "well-established principle that a municipal corporation owning and operating a water system and selling water to individuals, although engaged in a public service, does so in its business or proprietary capacity, not in any governmental capacity, and *no distinction is to be drawn between such business whether engaged in by a municipality or by a private corporation*" (emphasis added)); *Wagner v. City of Rock Island*, 146 Ill. 139, 154, 34 N.E. 545, 548 (1893) ("when a municipal corporation undertakes to construct and operate water works, it does so in the exercise of its private and not of its governmental functions"). In such a capacity, Tinley Park's actions are not subject to preemption by the Act.

█ Tinley Park argues that the Water Supply Contract is unambiguous and bars Citizens from providing Lake Michigan water purchased under the contract to the A&M Parcel. In construing any contract, the court's function is to give effect to the intent of the parties at the time the agreement was made. *City of Chicago Heights v. Crotty*, 287 Ill. App. 3d 883, 885, 679 N.E.2d 412, 413 (1997). If the terms of a contract are clear and unambiguous, then the intent of the parties must be ascertained solely from the words used. *Joseph v. Lake Michigan Mortgage Co.*, 106 Ill. App. 3d 988, 991, 436 N.E.2d 663, 665 (1982); *Schoeneweis v. Herrin*, 110 Ill. App. 3d 800, 806, 443 N.E.2d 36, 41 (1982). A contract is ambiguous if its terms are capable of being understood in more than one sense because either an indefiniteness of expression or a double meaning is attached to them. *Joseph*, 106 Ill. App. 3d at 991, 436 N.E.2d at 665. Ambiguity is a question of law for the court to decide. *Joseph*, 106 Ill. App. 3d at 991, 436 N.E.2d at 665; *URS Corp. v. Ash*, 101 Ill. App. 3d 229, 233, 427 N.E.2d 1295, 1299 (1981).

Tinley Park argues that the restrictions in the Water Supply Contract are clear and unambiguous and should be enforced. Specifically, Tinley Park directs us to the language of the second sentence of paragraph 6: "Citizens will not use water purchased under this Agreement within the *Tinley Park planning area as shown on the map attached hereto.*" (Emphasis added.) Tinley Park recites the boundaries of this restricted area, as they are set forth on the attached map of the

Tinley Park planning area as it existed in 1982, and points out that it is uncontested that the restricted area includes the A&M Parcel. Tinley Park, consequently, maintains that the restrictive provision in question contains no ambiguity.

Plaintiff Orland Hills, on the other hand, focuses on the truncated portion of the above-quoted sentence: "Citizens will not use water purchased under this Agreement within the *Tinley Park planning area.*" (Emphasis added.) Plaintiff next informs this court that Tinley Park defines its planning area in its comprehensive plan, which is neither a part of the Water Supply Contract nor referred to in the contract, as follows:

> "The planning area includes the incorporated area of the Village and the *adjacent unincorporated land area* around the incorporated area of the Village." (Emphasis added.)

Plaintiff thus argues that the restriction in paragraph 6 of the Water Supply Contract does not prohibit Citizens from servicing the A&M Parcel with water because the A&M Parcel is no longer within the Tinley Park "planning area" because it is no longer the adjacent *unincorporated* land around the incorporated area of Tinley Park because the parcel has been annexed by Orland Hills.

We disagree with plaintiff's rules of contract construction. Plaintiff has not cited to any legal authority enabling it to truncate the term "Tinley Park planning area as shown on the map attached hereto," in order to use some other language, from an instrument that was not referred to in the contract, to explain the now-truncated term "Tinley Park planning area." We are especially unconvinced by plaintiff's argument, considering the fact that in another part of its brief, plaintiff states the following: "The terms of the Tinley/Citizens contract are not ambiguous. There is no dispute as to the language of that contract."

In any event, Tinley Park responds that plaintiff's construction is flawed: in interpreting a contract, meaning and effect must be given to every term and provision, if possible, since it is presumed that every clause in the contract was inserted deliberately and for a purpose and that the language was not employed idly. *Martindell v. Lake Shore National Bank,* 15 Ill. 2d 272, 283, 154 N.E.2d 683, 689 (1958); *State Farm Mutual Automobile Insurance Co. v. Schmitt,* 94 Ill. App. 3d 1062, 1065, 419 N.E.2d 601, 603 (1981). Tinley Park thus contends that the second sentence of paragraph 6, read as a whole, is unambiguous in its intent to fix the boundaries of the restricted area to those shown on the map. We agree with Tinley Park that the language of paragraph 6 is clear and unambiguous. We, therefore, agree that the restrictions in paragraph 6, being clear and unambiguous, must be

enforced as written. *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 112, 618 N.E.2d 418, 423 (1993).

■ Plaintiff next attempts to deny that the Water Supply Contract prohibits Citizens from servicing the A&M Parcel with Lake Michigan water purchased under the contract. It directs this court to the following language in paragraph 3 of the Water Supply Contract:

> "Oak Lawn agrees to furnish and Citizens agrees to take, under and in accordance with the terms thereof, all the water supply requirements of its water system in order to supply the residential, commercial, industrial, and corporate water requirements within its certificated service areas in the vicinities of the corporate limits of the Village of [Orland Hills]."

Plaintiff thus claims that the Tinley Park/Citizens Water Supply Contract "unequivocally states that Citizens is obligated to service the A&M Parcel." We disagree. It is apparent that this language deals with the quantity of water that Oak Lawn, which is not a party to this action, "agrees to *furnish*" and Citizens "agrees to *take*" in order to supply Citizens' customers in the Orland Hills area. Clearly, this language does not transform the requirement that Citizens purchase a certain quantity of water from Oak Lawn into a mandate that Citizens supply some of this water to the A&M Parcel.

■ Plaintiff next argues that the terms of the Tinley Park/Citizens Water Supply Contract, as interpreted by defendants, prevent Citizens from performing its obligations to Orland Hills under the preexisting franchise ordinance and are therefore void on the grounds of public policy. *Blue Dolphin Investments, Ltd. v. Kane*, 687 P.2d 533, 534 (Colo. App. 1984). In that case, the court stated, "We will not give effect to a contractual provision which has as its purpose wrongful preclusion of a third party's exercise of a valid contractual right." *Blue Dolphin Investments*, 687 P.2d at 534. Plaintiff further cites to section 194 of the Restatement (Second) of Contracts (Restatement), which states:

> "A promise that tortiously interferes with performance of a contract with a third person or a tortiously induced promise to commit a breach of contract is unenforceable on grounds of public policy." Restatement (Second) of Contracts § 194 (1979).

■ Tinley Park responds that this argument is without merit. First, Tinley Park contends that the timeline of events speaks otherwise: the Orland Hills franchise was passed in 1962; Citizens entered into the Water Supply Contract in 1982; the franchise expired in 1991; and no dispute arose between the parties until Orland Hills annexed the A&M Parcel in 1999. Tinley Park appears to argue that as things stood in 1982, the restrictions in the Water Supply Contract were not intended to preclude Orland Hills from exercising its valid

contractual rights. Second, Tinley Park points out that the Commission, in its exclusive regulatory capacity, approved the Water Supply Contract, including its restrictions, and argues that the Commission's approval of the Water Supply Contract preempted the franchise to the extent that it interfered with the contract. Moreover, Tinley Park argues that these restrictions, in fact, became part of the implied contract because section 7 of the franchise ordinance provided:

> "[Orland Hills] and [Citizens] hereby agree that this ordinance shall be subject to all rules and regulations governing service by [Citizens] approved by the Illinois Commerce Commission *** and that all such rules and regulations which may be hereafter approved by the Illinois Commerce Commission *** shall be and become a part of this ordinance to the same extent and with the same effect as if said rules and regulations were herein set out in full."

Lastly, Tinley Park points out that from 1962 to 1982, Citizens' only source of water was well water, and that the Water Supply Contract provided an enormous benefit to the residents of Orland Hills, as they now had access to Lake Michigan water. Tinley Park therefore argues that the Water Supply Contract did not have a wrongful purpose and is not unenforceable on grounds of public policy. We agree with Tinley Park that for all of the above reasons, plaintiff's claim of tortious interference must fail.

Plaintiff Orland Hills, in the alternative, argues that Tinley Park is without jurisdiction to impose extraterritorial control over the A&M Parcel, which is an existing part of Orland Hills, another municipality: "Since municipalities are creatures of statute, they have no jurisdiction beyond their corporate boundaries unless that jurisdiction is conferred by legislature. [Citation.] Thus, extraterritorial jurisdiction of a municipality is strictly controlled by statute." *City of Springfield v. Judith Jones Dietsch Trust*, 321 Ill. App. 3d 239, 241-42, 746 N.E.2d 1272, 1273 (2001); see also *People ex rel. Aurora National Bank v. City of Batavia*, 91 Ill. App. 3d 716, 721, 414 N.E.2d 916, 920 (1980) (city had no independent power to enter into restrictive covenants to regulate use of land beyond its borders). More specifically, plaintiff argues that Tinley Park is exerting impermissible extraterritorial control not only in preventing the delivery of water service to the A&M Parcel, but also in manipulating the Water Supply Contract in an attempt to cause the A&M Parcel to disconnect from Orland Hills, so that it could be annexed by Tinley Park.

Tinley Park responds that plaintiff's reliance on *City of Springfield* and *Aurora National Bank* is misplaced: these cases hold that a city's zoning enactments are limited to its territorial boundaries and are

invalid to the extent that they seek to impose zoning regulations and restrictions on land outside the city limits. Tinley Park contends that because it does not seek to impose restrictions on the classification, use or development of the A&M Parcel, plaintiff Orland Hills' extraterritorial jurisdiction argument is inapplicable. Thus, plaintiff seems to argue that Tinley Park's actions should be governed by the provisions of the Illinois Municipal Code (Municipal Code) which address extraterritorial powers of municipalities, while Tinley Park appears to argue that so long as it is not exercising zoning-type powers, extraterritorial jurisdiction is not at issue at all.

We agree with plaintiff's general contention that a municipality may generally exercise authority only within its corporate limits. *Dean Milk Co. v. City of Aurora*, 404 Ill. 331, 335, 88 N.E.2d 827, 830 (1949) ("It is an inherent limitation upon the powers of a city that they shall operate only within the corporate boundaries of the municipality"); *City of Springfield*, 321 Ill. App. 3d at 242. We would like to clarify, however, that plaintiff's contention that "municipalities are creatures of statute" (*City of Springfield*, 321 Ill. App. 3d at 242, citing *Petterson v. City of Naperville*, 9 Ill. 2d 233, 243, 137 N.E.2d 371, 377 (1956)) oversimplifies the present status of municipalities in Illinois. In 1970, the Illinois Constitution was amended to give municipalities additional power and authority, as well as to create the so-called "home rule" municipalities. See R. Cope, *Annexation Agreements—Boundary Agreements: Walking a Fine Line into the Future—A Map of the Dangers to the Unwary Land Use Traveler*, 17 N. Ill. U. L. Rev. 377, 386 (1997). Article VII, section 6, sets out the powers of home rule municipalities:

> "A County which has a chief executive officer elected by the electors of the county and any municipality which has a population of more than 25,000 are home rule units. Other municipalities may elect by referendum to become home rule units. Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a).

By contrast, non-home-rule municipalities must derive their authority to act from the legislature. See *People ex rel. Village of Lake Bluff v. City of North Chicago*, 224 Ill. App. 3d 866, 871, 586 N.E.2d 802, 805 (1992). Therefore, home rule municipalities may have broader powers than non-home-rule municipalities. However, "an examination of the [Record of Proceedings of the Sixth Illinois Constitutional Convention] shows that the intention was not to confer extraterritorial

sovereign or governmental powers directly on home-rule units. The intendment shown is that whatever extraterritorial governmental powers home-rule units may exercise were to be granted by the legislature." *City of Carbondale v. Van Natta*, 61 Ill. 2d 483, 485, 338 N.E.2d 19, 21 (1975). Accordingly, we agree with plaintiff that a municipality, whether home rule or non-home-rule, may exercise authority outside its boundaries only when the state legislature grants it such authority. *City of Carbondale*, 61 Ill. 2d at 485, 338 N.E.2d at 21; *Petterson*, 9 Ill. 2d at 243, 137 N.E.2d at 377.

█ With respect to Orland Hills' jurisdiction over property that is the subject of an annexation agreement, section 11—15.1—2.1 of the Municipal Code provides that such property "is subject to the ordinances, control, and jurisdiction of the [annexing] municipality in all respects the same as property owned by the municipality that lies within its corporate limits."[7] 65 ILCS 5/11—15.1—2.1(b) (West 2002). The record reveals that in a separate proceeding, which was not appealed, the circuit court found the annexation of the A&M Parcel into Orland Hills to be lawful. However, we also note that Tinley Park does have "planning jurisdiction"[8] over a contiguous territory of land within 1.5 miles of its corporate limits and not included in any other municipality. 65 ILCS 5/11—12—5 (West 2002). Where property is subject to such conflicting claims of jurisdiction, the annexing municipality's subdivision and zoning jurisdiction overrides another municipality's statutory grant of planning jurisdiction over its formerly unincorporated planning area. *City of Springfield*, 321 Ill. App. 3d at 242, 46 N.E.2d at 1273. Therefore, plaintiff is correct that the A&M Parcel, upon its annexation into Orland Hills, stopped being a part of the Tinley Park "planning area," as it is defined by statute,

---

[7]This section does not apply to "(i) a county with a population of more than 3,000,000, (ii) a county that borders a county with a population of more than 3,000,000, *** unless the parties to the annexation agreement have, at the time the agreement is signed, ownership or control of all property that would make the property that is the subject of the agreement contiguous to the annexing municipality." 65 ILCS 5/11—15.1—2.1(b) (West 2002). Orland Hills is located in Cook County, a county with a population of more than 3 million. However, the record reveals that in a separate proceeding brought by Tinley Park to fight the annexation of the A&M Parcel into Orland Hills (which was not appealed) the circuit court found for Orland Hills. Consequently, this judgment has a preclusive effect as to the issue whether the annexation of the A&M Parcel was proper.

[8]A municipality with a comprehensive development plan is allowed to make such a plan applicable to subdivisions up to 1.5 miles outside of its corporate limits. 65 ILCS 5/11—12—5 (West 2002).

and that Tinley Park lost any planning jurisdiction over the parcel. On the other hand, Tinley Park is also correct in its contention that the zoning or planning jurisdiction argument is inapplicable here because Tinley Park did not attempt to exercise either type of jurisdiction over the A&M Parcel.

Plaintiff next appears to argue that Tinley Park is, nevertheless, exercising improper extraterritorial regulatory jurisdiction because it seeks to enforce a contract that restricts a public utility's service in a territory that is not only outside Tinley Park's corporate boundaries, but, moreover, is within the corporate limits of another municipality, namely Orland Hills. We first note that, in contrast to the exercise of governmental authority outside of its territorial limits, a municipality may, in its business or proprietary capacity, exercise extraterritorial powers, such as the power to contract. 62 C.J.S. *Municipal Corporations* § 137 (1999). As previously discussed, it is well established that where a municipality owns and operates a water system for the purpose of selling water to customers, it is regarded as acting in a business or proprietary capacity and is treated as if it were a private utility company. *Baltis*, 3 Ill. 2d 388, 397-98, 121 N.E.2d 495, 500 (1954). The facts of this case fully support treating Tinley Park's water supply business as a private utility company: during the arguments before this court, Tinley Park had admitted that its water supply business is profitable and that it was concerned with protecting its business from competition. We observe that the restrictions in the Tinley Park/Citizens Water Supply Contract are consistent with Tinley Park's business concerns. Accordingly, Tinley Park was not limited by jurisdictional restrictions imposed on municipalities when, while acting in its business capacity, it entered into the Water Supply Contract.

Plaintiff Orland Hills, however, contends that Tinley Park is in fact competing for an existing portion of another municipality, Orland Hills, and using the contractual restrictions in the Water Supply Contract to cause the disconnection of the A&M Parcel from Orland Hills and planned annexation into Tinley Park. However, we cannot focus on the possible underlying motivations of Tinley Park behind its insistence to enforce the restrictions in the Water Supply Contract. It suffices to say that Tinley Park is doing no more than enforcing a valid provision of a contract into which it entered in a private capacity, before the annexation of the A&M Parcel ever occurred, something it had a right to do under general contract law.

Plaintiff Orland Hills, in the alternative, argues that Citizens' certificate of public convenience and necessity, granted to it by the Commission, obligates Citizens to provide water service to the A&M

Parcel. The General Assembly created the Commission, pursuant to the Public Utilities Act (220 ILCS 5/1—101 *et seq.* (West 2002)), to supervise and regulate all public utilities (220 ILCS 5/4—101 *et seq.* (West 2002)) and vested it with plenary powers with respect to the supervision and regulation of public utilities (220 ILCS 5/4—201 *et seq.* (West 2002); *City of Chicago*, 349 Ill. at 346-47, 182 N.E. at 439; *Illinois Power & Light Corp. v. Commerce Comm'n*, 320 Ill. 427, 430-31, 151 N.E. 236, 237 (1926); *Fountain Water District v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 696, 701, 684 N.E.2d 145, 150 (1997)). The Act "created a comprehensive scheme for the regulation of public utilities." *Kirwin*, 173 Ill. App. 3d at 705, 528 N.E.2d at 203. The Act contemplates actual supervision of every public utility, so that continuous, adequate, uniform, and satisfactory service shall be rendered to the public. *Commerce Comm'n v. Chicago Rys. Co.*, 362 Ill. 559, 566-67, 1 N.E.2d 65, 69 (1936); *Fountain Water District*, 291 Ill. App. 3d at 701, 684 N.E.2d at 150.

■ All parties agree that Citizens is a public utility regulated by the Commission. Furthermore, all parties agree that Citizens may not operate in Illinois unless it holds either a municipal franchise or a certificate of public convenience and necessity:

"No public utility not owning any city or village franchise *** and not possessing a certificate of public convenience and necessity from the Illinois Commerce Commission *** shall transact any business in this State until it shall have obtained a certificate from the Commission that public convenience and necessity require the transaction of such business." 220 ILCS 5/8—406(a) (West 2002).

All parties further agree that the Orland Hills/Citizens franchise agreement expired in 1991. Plaintiff apparently argues that Citizens' certificate of public convenience and necessity obligates it to service the A&M Parcel, notwithstanding the Commission's approval of the Water Supply Contract.

Citizens obtained a certificate of public convenience and necessity for the territory which encompasses the A&M Parcel in 1960. Plaintiff Orland Hills contends that once a public utility obtains such a certificate, it is obligated to continue to provide service to the areas stated in the certificate unless it receives permission from the Commission allowing it to discontinue service. Section 8—508 of the Act provides in relevant part:

"[N]o public utility shall abandon or discontinue any service *** without first having secured the approval of the Commission." 220 ILCS 5/8—508 (West 2002).

Plaintiff, therefore, argues that because Citizens never requested or obtained permission from the Commission to discontinue service to

that certificated area, Citizens is obligated to provide water service to the A&M Parcel.

■ First, Citizens responds that it has no plans to abandon or discontinue service to its Orland Hills customers. It further contends that the instant case does not involve Citizens discontinuing water service to the A&M Parcel; rather, it involves a vacant and undeveloped property that does not receive water service from Citizens. Citizens, therefore, argues that it cannot "abandon" or "discontinue" water service to a parcel which it has never serviced. Tinley Park similarly points out that our supreme court had defined the terms "abandon" and "discontinue," as they are used in section 8—508 of the Act, as follows:

> "Abandon means to relinquish or give up with intent of never again reserving or claiming one's rights or interest. [Citations.] It is a voluntary act. [Citations.] An involuntary act is not an abandonment. [Citation.] Discontinue may be a voluntary act, but may be brought about against the will of a person. [Citations.] Discontinue means to cease using, to interrupt continuance of." *City of Geneseo*, 378 Ill. at 525-26, 39 N.E.2d at 36.

Tinley Park argues that these definitions presuppose that there existed a service which could be abandoned or discontinued, and that under these definitions, neither an abandonment nor a discontinuance of service can take place with respect to the A&M Parcel because Citizens never provided it with water service. We agree that this case does not implicate the abandonment and discontinuance provisions of section 8—508.

Second, while Citizens agrees that it provides water service to its customers in Orland Hills based upon its certificates of public convenience and necessity, it disputes the mandatory nature of its obligations under the certificate and argues that a certificate of public convenience and necessity is deemed to be a license and merely grants a public utility permission to serve the area. *Chicago Rys. Co. v. Commerce Comm'n*, 336 Ill. 51, 70, 167 N.E. 840, 848 (1929) ("The certificate of public convenience and necessity confers no property right on the utility in whose favor it is granted. It is *** but *** a mere permission to do a specified act within a fixed time"); see *Amalgamated Trust & Savings Bank v. Village of Glenview*, 98 Ill. App. 3d 254, 260, 423 N.E.2d 1230, 1234 (1981) (same). Furthermore, Citizens contends that a certificate of public convenience and necessity is not to be construed as granting a monopoly or an exclusive privilege, immunity or franchise. 220 ILCS 5/8—406(f) (West 2002). Plaintiff Orland Hills, on the other hand, has not cited to any authority in support of its argument that the certificate of public convenience

and necessity obligates Citizens to provide water service to the A&M Parcel.

We note, however, that section 8—101 of the Act provides:

> "A public utility shall, upon reasonable notice, furnish to all persons who may apply therefor and be reasonably entitled thereto, suitable facilities and service, without discrimination and without delay." 220 ILCS 5/8—101 (West 2002).

However, section 8—504 provides as follows:

> "The Commission is authorized to make rules and regulations concerning the conditions to be contained in and become a part of contracts for public utility services, and any and all services concerning the same, or connected therewith." 220 ILCS 5/8—504 (West 2002).

In light of section 8—504, we agree with Tinley Park's contention that the Commission's express approval of the Water Supply Contract ratified its provisions, including the restrictions imposed by paragraphs 6 and 9. With these restrictions ratified by the Commission, it follows that the A&M Parcel was not reasonably entitled, within the meaning of section 8—101, to services from Citizens. Consequently, we agree with defendants that the certificate of public convenience and necessity does not obligate Citizens to provide service to the A&M Parcel under the circumstances of this case.

In sum, plaintiff Orland Hills failed to meet its burden of establishing that Citizens has a mandatory obligation under either the implied contract or the certificate of public convenience and necessity to service the A&M Parcel. Moreover, plaintiff's right to enforce the implied contract has been preempted by the Act. On the other hand, the Tinley Park/Citizens Water Supply Contract, which was expressly approved by the Commission in the exercise of its exclusive regulatory authority, is valid and enforceable, as are the restrictions contained therein. Accordingly, we find that Citizens is not obligated to provide water service to the A&M Parcel.

## CONCLUSION

For the reasons set forth above, we reverse the judgment of the circuit court granting summary judgment to plaintiff Orland Hills and enter judgment for defendants Citizens and Tinley Park.

Reversed.

O'MALLEY, P.J., and McNULTY, J., concur.